# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **PHYSIOTHERAPY** | ) | |
| **ASSOCIATES, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:16-cv-02014-ACA** |
| | ) | |
| **JAMES DOUG DELOACH,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

In this breach of contract action, Plaintiff Physiotherapy Associates, Inc. asserts that, while working for Physiotherapy and after he quit to work for a competitor, Defendant James Doug DeLoach breached the terms of non-compete and non-solicitation agreements that he had entered with Physiotherapy. (*See* Doc. 1). Physiotherapy contends that Mr. DeLoach's breach has caused it to lose business and employees. Physiotherapy seeks monetary damages and a permanent injunction prohibiting Mr. DeLoach from breaching his non-compete and non-solicitation agreements.

This case is before the court on Mr. DeLoach's motion for summary judgment. (Doc. 75). The parties have fully briefed the motion. (Docs. 75, 82, 87). The court **WILL GRANT IN PART** and **DENY IN PART** Mr. DeLoach's motion. Because Physiotherapy has not presented evidence indicating that

Mr. DeLoach breached the non-compete and non-solicitation agreements, the court **WILL GRANT SUMMARY JUDGMENT** in favor of Mr. DeLoach and against Physiotherapy on Physiotherapy's claim seeking monetary damages. As a result, the court finds as moot Physiotherapy's request for injunctive relief, and **WILL DISMISS WITHOUT PREJUDICE** that request. Accordingly, the court **WILL DENY AS MOOT** Mr. DeLoach's motion for summary judgment on the claim for injunctive relief.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence in the light most favorable to the non-moving party. *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). "The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## II. FACTUAL BACKGROUND

Physiotherapy owns and operates physical therapy and occupational therapy clinics and provides sports medicine services to schools. (Doc. 79-2 at 10; Doc. 83-1 at 3). More than 90% of its business comes from physician referrals, and its

largest referral source in north Alabama is Andrews Sports Medicine and Orthopaedic Center (the "Andrews Group" or "Andrews"). (Doc. 79-2 at 12-13; Doc. 83-1 at 3).

Mr. DeLoach is a licensed occupational therapist who has practiced occupational therapy and managed physical rehabilitation facilities in northern Alabama since 1994. (Doc. 75-6 at 3; Doc. 79-1 at 4, 18-24). Physiotherapy offered Mr. DeLoach a position as an Area Vice President in January 2013, and it confirmed its offer with a letter dated January 14, 2013 (the "Offer Letter"). (Doc. 1-1; Doc. 75-6 at 4).

The Offer Letter begins by stating that Mr. DeLoach is an at will employee, which "means that you are not employed for a set period of time, and you or the Company may terminate your employment at any time and for any reason." (Doc. 1-1 at 2). And although the Offer Letter states that "[t]his offer letter . . . is not intended to create an employment contract," it also provides that signing the Offer Letter and accepting employment with Physiotherapy signals his agreement "to be legally bound and obligated to comply with" the non-compete and non-solicitation agreements. (*Id.* at 1, 4).

Mr. DeLoach's non-compete agreement required that, for a period of twelve months after termination from Physiotherapy, Mr. DeLoach would "not, directly or indirectly, own, manage, operate, control, be employed by, perform services for,

consult with, solicit business for, participate in, or be connected with the ownership, management, operation, or control of, any business which performs outpatient rehabilitation or orthotics or prosthetic services in the Market Area." (*Id.* at 4). The agreement defined the "Market Area" as "the area that is within a ten (10) mile radius of any of the Company's facilities [ ] at which you provided services during your employment . . . or for which you had . . . management or supervisory responsibility." (Doc. 1-1 at 4).

Mr. DeLoach also agreed not to solicit customers, vendors, and/or associates of Physiotherapy for twelve months after his employment with Physiotherapy terminated. (Doc. 1-1 at 4–5). This meant that Mr. DeLoach could not

> solicit, induce, or attempt to induce any past or current Customer or vendor of the Company to (a) cease doing business in whole or in part with or through the Company, or (b) do business with any other person, firm, partnership, corporation, or other entity which performs services material similar to or competitive with those provided by the Company.

(*Id.* at 4). The Offer Letter defines "Company" as "Physiotherapy Associates" and "Customer" as "any person, division or unit of a business enterprise with whom within a two (2) year period preceding the date of termination of your employment with the Company, the Company . . . held a business or contractual arrangement to perform services for Company. (*Id.* at 1, 4–5; Doc. 82 at 20). Mr. DeLoach is also prohibited from "solicit[ing], interfer[ing] with, or endeavor[ing] to cause any [Physiotherapy] Associate to leave his or her employment." (Doc. 1-1 at 5).

As an area vice president for Physiotherapy, Mr. DeLoach's job responsibilities included providing hands-on occupational therapy to patients, managing clinics for Physiotherapy in north Alabama, and developing business opportunities in north Alabama. (Doc. 75-6 at ¶ 5; Doc. 79-1 at 5, 7-8; Doc. 79-2 at 22). In particular, Mr. DeLoach was responsible for developing Physiotherapy's relationship with the Andrews Group, and he interacted with physicians or the CEO of Andrews at least twice a month. (Doc. 79-1 at 38; Doc. 83-1 at ¶ 18).

In early 2016, another company acquired Physiotherapy, although Physiotherapy continued to operate under the same name. (Doc. 76-1 at 6–7; Doc. 79-2 at 11). The merger agreement provides that "[a]s of [January 22, 2016], neither [Physiotherapy] nor any [Physiotherapy] Subsidiary is a party to or bound by . . . any agreement with any employee [ ] that . . . provides for an annual compensation opportunity . . . to exceed $100,000 . . . ." (*Id.* at 27). It is undisputed that Mr. DeLoach's annual compensation exceeded $100,000.

After the merger, Physiotherapy's largest referral source, the Andrews Group, developed concerns about the post-merger management of Physiotherapy. (Doc. 79-5 at 10). As it happens, around that time another company—ATI—that owns and operates physical therapy clinics was looking to expand into north Alabama. (Doc. 79-4 at 7–9; Doc. 83-1 at 6). In August 2016, ATI's Chief Operations Officer, Brent Mack, contacted the Andrews Group's CEO, Lisa

Warren, to arrange a meeting to discuss ATI's business and plans for expansion. (Doc. 79-1 at 27, 46; Doc. 79-4 at 28–29). During the meeting, Ms. Warren expressed frustration with Physiotherapy's new management. (Doc. 79-4 at 55). Mr. Mack believed that an opportunity existed for ATI to expand its business by getting referrals from the Andrews Group. (*Id.* at 29, 53–55).

Mr. DeLoach had no involvement in the initial contact between Mr. Mack and Ms. Warren, (doc. 79-4 at 9, 29, 53), but around the time when they were meeting, Mr. Mack also contacted Mr. DeLoach about interviewing for a position with ATI. (Doc. 79-1 at 27-28). On August 18, 2016, Mr. DeLoach sent ATI a copy of his Offer Letter containing the non-compete and non-solicitation agreements with Physiotherapy. (Doc. 79-1 at 29-30; Doc. 84-1 at 2–8). Later that same month, while Mr. DeLoach was still working for Physiotherapy, he sent to ATI an action plan entitled "DeNovo and Acquisition Strategy." (Doc. 84-7). In the action plan, Mr. DeLoach identified potential locations for ATI clinics in Alabama, including locations for clinics to open after the expiration of his non-compete agreement, and he gave ATI information about the market near those locations. (*Id.*).

Mr. DeLoach continued working for Physiotherapy while he and ATI were having those discussions. In early September 2016, Mr. DeLoach suggested to Physiotherapy's CEO, Dan Bradley, that Mr. Bradley meet with physicians at

Andrews to address their concerns. (*Id.*). Mr. DeLoach arranged a meeting on September 7, 2016 between Mr. Bradley and Ms. Warren as well as several physicians from Andrews. (Doc. 75-5 at ¶¶ 6-7; Doc. 79-1 at 12; Doc.79-5 at 14, 16).

The meeting did not go well. Andrews expressed concerns about three of Physiotherapy's new management policies, and Mr. Bradley took offense to Andrews raising those concerns. (Doc. 79-5 at 11-12, 39). After the meeting, Mr. Bradley questioned whether Mr. DeLoach's loyalties lay with Physiotherapy or the Andrews Group. (Doc. 79-5 at 13-16).

Mr. DeLoach decided to resign from Physiotherapy and accept a position with ATI. (Doc. 75-5 at ¶ 4). On September 12, 2016, Mr. DeLoach accepted ATI's offer and executed his offer letter with ATI. (Doc. 79-4 at 27). He tendered his resignation soon after, but continued to work for Physiotherapy until October 18, 2016. (Doc. 79-1 at 32–33). On one of his last days at Physiotherapy, Mr. DeLoach visited the Andrews Group's office at St. Vincent's hospital and told Andrews that he was leaving Physiotherapy to work for ATI. (Doc. 79-1 at 34-35, 38).

Mr. DeLoach started working for ATI on October 31, 2016, and he was ATI's first employee in Alabama. (Doc. 79-1 at 38; Doc. 79-4 at 8). During November and December 2016, Mr. DeLoach helped ATI prioritize areas to target

for clinic locations. (*See* Doc. 84-20 at 22; Doc. 84-33 at 23, 27, 39). As part of his responsibilities, Mr. DeLoach arranged a meeting on November 30, 2016 between Ms. Warren (Andrews Group CEO) and Bob Leonard, a vice president for ATI. (Doc. 79-1 at 64; Doc. 84-17 at 2; Doc. 84-18 at 2-3). The purpose of the meeting was to ensure "the lines of communication were together" between Mr. Leonard and Ms. Warren. (Doc. 79-1 at 64).

Mr. DeLoach also coordinated a meeting between ATI management and the Andrews Group on December 12, 2016. (Doc. 84-3 at 3; Doc. 84-16 at 2; Doc. 84-18 at 2–3; Doc. 84-33 at 29). Although Mr. DeLoach did not attend the meeting, he helped ATI prepare for it. (Doc. 79-1 at 71; Doc. 84-21; Doc. 84-22; Doc. 84-23; Doc. 84-25; Doc. 84-33 at 30). Mr. DeLoach talked with Ms. Warren in the week before the meeting about the Andrews Group's "current pain points" with Physiotherapy and about what Physiotherapy did well for Andrews. (Doc. 84-21 at 2; Doc. 84-33 at 30). During the meeting, ATI intended to present information about the company to the Andrews Group, including its plans to open clinics in Alabama. (Doc. 84-20). In particular, ATI planned to tell the Andrews Group that it "is aggressively building a pipeline of new clinics to serve the Andrews' patient base" and that it was targeting areas for clinics that were near existing Physiotherapy sites. (*Id.* at 22–23).

ATI opened its first clinic in Alabama in the spring of 2017 in Lincoln, Alabama. (Doc. 79-1 at 4; Doc. 79-4 at 42). Since ATI's clinics have opened, Physiotherapy has had fewer patients referred to it by the Andrews Group. (Doc. 83-1 at ¶ 24). Specifically, "[i]n July 2017, Physiotherapy experienced a decline of approximately 34.0% in new patient counts from referrals in the North Alabama Market from physicians at the Andrews [Group] as compared to July 2016." (Doc. 84-32 at ¶ 5). Based on the decline in patient referrals, Physiotherapy expects to lose more than $2.4 million in revenue. (*Id.*).

The term of the non-compete and non-solicitation agreements expired on October 18, 2017, twelve months after Mr. DeLoach left Physiotherapy. (*See* Doc. 1-1 at 4–5; Doc. 79-1 at 33). Thus, Mr. DeLoach is no longer bound by the agreements.

## III. ANALYSIS

Mr. DeLoach asks the court to enter summary judgment in his favor on Physiotherapy's breach of contract claim. (Doc. 75). He contends that he is entitled to summary judgment because (1) the Offer Letter containing the non-compete agreement is not a binding contract between the parties; (2) Physiotherapy disclaimed its contract with him; (3) he did not solicit any Physiotherapy employee or customer on behalf of ATI; (4) he did not violate the non-compete agreement

and the agreement is unenforceable under Alabama law; and (5) Physiotherapy's damages are speculative.

The construction and interpretation of the contract is governed by the laws of the Commonwealth of Pennsylvania. (Doc. 1-1 at 5 ¶ 4). Under Pennsylvania law, a party must establish three elements to prove a breach of contract: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (*quoting CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). In interpreting the language of a contract, a court attempts to ascertain and give effect to the intent of the parties. *Crawford Central Sch. Dist. v. Commonwealth*, 888 A.2d 616, 623 (2005). When the words of an agreement are clear and unambiguous, the court must glean the intent of the parties from "the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). Because "[c]ourts do not assume that a contract's language was chosen carelessly," *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001), "a meaning cannot be given to it other than that expressed," *Steuart*, 444 A.2d at 661.

A. <u>**The existence of a binding contract between the parties**</u>

Mr. DeLoach argues that the Offer Letter containing the non-compete and non-solicitation agreements is not a binding contract between the parties because it

expressly states that it is not an employment contract. (Doc. 75 at 32). The court is not persuaded by that argument.

To determine if Mr. DeLoach is bound by the terms of the Offer Letter's non-compete and non-solicitation agreements, the court looks to the language of the letter. When examining the intent of the parties all provisions in the agreement will be construed together and each will be given effect. *See Murphy*, 777 A.2d at 429. The Offer Letter, read as a whole, shows that the parties intended the non-compete and non-solicitation agreements to be a binding contract between the parties.

The first section of the Offer Letter states: "This offer letter confirms the terms of your employment . . . . It is not intended to create an employment contract and the terms/conditions of your employment may be changed at [Physiotherapy's] discretion. Employment with [Physiotherapy] is on an at-will basis." (Doc. 1-1 at 2). But the section of the Offer Letter containing the non-compete and non-solicitation agreements states: "By signing this offer letter and accepting employment with [Physiotherapy] you are agreeing to be legally bound and obligated to comply with the following covenants," including the non-compete and non-solicitation agreements. (*Id.* at 4–5).

The statement in the Offer Letter that the letter "is not intended to create an employment contract" informs the person signing the letter that he or she will be

an at-will employee. (Doc. 1-1). The statement does not alter or conflict with the express language stating that an employee who signs the Offer Letter is "legally bound and obligated to comply with" the non-compete and non-solicitation agreements because those agreements are not an employment contract. (*Id.* at 4–5).

As a result, Mr. DeLoach is not entitled to summary judgment on the grounds that the Offer Letter is not a binding contract between the parties.

**B.      Physiotherapy's alleged disclaimer of the agreement between the parties**

Mr. DeLoach also argues that Physiotherapy cannot enforce the non-compete and non-solicitation agreements against him because it expressly disclaimed its contract with him when it was acquired by another company. (Doc. 75 at 32). The agreement and plan of merger states that "neither [Physiotherapy] nor any [Physiotherapy] Subsidiary is a party to or bound by . . . any agreement with any employee or independent contractor that . . . provides for an annual compensation opportunity . . . that exceeds . . . $100,000." (Doc. 76-1 at 27). Mr. DeLoach relies on that language to assert that Physiotherapy is not a party to the Offer Letter and, therefore, cannot enforce the non-compete and non-solicitation agreements against him as a matter of law. (Doc. 75 at 32–33). The court does not agree.

Undisputed evidence establishes that Physiotherapy continued to employ and pay Mr. DeLoach after the merger in 2016. (Doc. 79-1 at 26). Thus, Physiotherapy continued to perform any obligations it had to Mr. DeLoach under the Offer Letter, which creates a question of fact regarding whether Physiotherapy actually disclaimed its agreement with Mr. DeLoach. As a result, Mr. DeLoach is not entitled to summary judgment on the grounds that Physiotherapy is not a party to the non-compete and non-solicitation agreements.

### C.  Breach of non-solicitation agreement

Mr. DeLoach's next argument is that Physiotherapy did not produce any evidence that he breached the non-solicitation agreement, either by soliciting any of Physiotherapy's employees or by soliciting any of its customers. (Doc. 75 at 26–30). Physiotherapy responds that Mr. DeLoach solicited a Physiotherapy employee by providing ATI with a Physiotherapy employee's contact information, and that he solicited a Physiotherapy customer by developing ATI's relationship with Andrews Group. (Doc. 82 at 24–26, 29).

#### 1.  Solicitation of Physiotherapy employees

Mr. DeLoach's contract with Physiotherapy prohibits him from "solicit[ing], interfer[ing] with, or endeavor[ing] to cause any [Physiotherapy] Associate to leave his or her employment." (Doc. 1-1 at 5). Physiotherapy contends that Mr. DeLoach violated that provision by providing contact information about its

former outreach coordinator, Alex Wolf, to ATI, after which Mr. Wolf left Physiotherapy to work for ATI. (Doc. 82 at 29). It points to evidence that Mr. DeLoach exchanged text messages with Mr. Wolf and, at ATI's request, gave ATI information about Mr. Wolf, including Mr. Wolf's phone number. (Doc. 82 at 9, 75-76; *see also* Doc. 79-1 at 75–76). However, Physiotherapy did not introduce evidence regarding the content or timing of the text messages, and Mr. Wolf attests that Mr. DeLoach did not solicit him to work for ATI, discuss ATI with him, or have any involvement in his decision to work for ATI. (Doc. 75-15 at 2). Finally, Physiotherapy's current regional vice president testified that providing a person with a phone number of one its employees upon request would not violate the non-solicitation agreement. (Doc. 79-2 at 27).

Viewing all of this evidence in the light most favorable to Physiotherapy, it is not sufficient to create a question of fact regarding whether Mr. DeLoach breached the non-solicitation agreement by soliciting Mr. Wolf on behalf of ATI. As a result, Mr. DeLoach is entitled to summary judgment on Physiotherapy's breach of contract claim to the extent the claim is based upon his alleged solicitation of Physiotherapy's employees.

### 2.     Solicitation of Physiotherapy customers

Mr. DeLoach's contract with Physiotherapy also prohibits "solicit[ing], induc[ing], or attempt[ing] to induce any past or current Customer or vendor of the

Company to (a) cease doing business in whole or in part with or through the Company, or (b) do business with any other person, firm, partnership, corporation, or other entity which performs services material similar to or competitive with those provided by the Company." (Doc. 1-1 at 4). Physiotherapy contends that Mr. DeLoach breached this provision by soliciting the Andrews Group to provide referrals for ATI. (Doc. 82 at 21–22). To prevail on that argument, Physiotherapy must establish that Andrews Group is a customer under the terms of the non-solicitation agreement.

The Offer Letter defines the "Company" as Physiotherapy Associates. (Doc. 101 at 1). It defines "Customer" as "any person, division or unit of a business enterprise with whom within a two [ ] year period preceding the date of termination of your employment with the Company, the Company had received services from Company or held a business or contractual arrangement to perform services for Company." (Doc. 1-1 at 4–5; *see also* Doc. 82 at 20). In Physiotherapy's brief in opposition to the motion for summary judgment, it represents that the definition is, instead, "any person, division or unit of a business enterprise with whom within a two (2) year period preceding the date of termination of [Defendant's] employment with the Company . . . Company held a business or contractual arrangement to perform services for[.]" (Doc. 82 at 20 (alterations in original)).

Physiotherapy's representation about the definition of "Customer" is an attempt to redraft the poorly drafted definition through omissions and alterations of the actual contract language. It made that attempt because the definition of customer in the Offer Letter does not make sense; it defines a customer of Physiotherapy as Physiotherapy itself. The Offer Letter states that a customer is someone "with whom . . . the Company had received services from Company or held a business or contractual arrangement to perform services for Company." (Doc. 1-1 at 4–5). In other words, it defines a customer as someone with whom Physiotherapy received services from Physiotherapy, or someone with whom Physiotherapy held a business or contractual arrangement to perform services for Physiotherapy. But, contrary to Physiotherapy's representation to this court, the Offer Letter does *not* define a customer as someone "with whom . . . Company held a business or contractual arrangement to perform services for[.]" (Doc. 82 at 20 (second alteration in original)).

The court rejects Physiotherapy's attempt to redraft the contract in its own favor. It drafted the Offer Letter, and it is bound by the language that it chose. That language, while poorly drafted and confusing, essentially provides that Physiotherapy is its own customer. Accordingly, there is no genuine dispute of material fact about whether Andrews Group is a customer of Physiotherapy or whether Mr. DeLoach breached the anti-solicitation agreement he entered with

Physiotherapy. Even assuming that Mr. DeLoach "solicit[ed], induce[d], or attempt[ed] to induce" Andrews Group to cease doing business with Physiotherapy, (*see* Doc. 1-1 at 4), that would not be a breach of the agreement because Andrews Group was not Physiotherapy's customer as defined in the contract.

In any event, even if the court accepted Physiotherapy's attempt to redraft the contract in its own favor, the court would still find that Physiotherapy has not created a genuine dispute of material fact about whether Andrews Group was a customer as defined by the contract. Physiotherapy says that its customers are people or entities "with whom . . . [it] held a business or contractual arrangement to perform *services* for." (Doc. 82 at 21 (one alteration omitted; other alterations and emphasis added)). The Offer Letter does not define the term "services." (*See* Doc. 1-1). Accordingly, the court will give the term its "'natural, plain, and ordinary meaning." *Cordero v. Potomac Ins. Co. of Illinois*, 794 A.2d 897, 900 (Pa. Super. Ct. 2002). "Services" is defined as "useful labor that does not produce a tangible commodity." Services, Merriam Webster's Collegiate Dictionary (10th ed. 1996). Black's Law Dictionary defines a "service" as "[t]he act of doing something useful for a person or company, usu[ally] for a fee." Service, Black's Law Dictionary (9th ed. 2009).

Jason Chambers, Physiotherapy's current regional vice president, testified that he is not aware of any services that Physiotherapy provides directly to physicians at the Andrews Group. (Doc. 79-2 at 17). And, for its part, Andrews says it is not Physiotherapy's customer. (Doc. 75-16 at 2). Physiotherapy, however, contends that it provides indirect services to Andrews because it provides services to Andrews' patients. (Doc. 82 at 20–21). The court declines the invitation to stretch the definition of services that far.

"Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed." *Murphy*, 777 A.2d at 429. Under Physiotherapy's redrafted language, a customer is a person or entity whom Physiotherapy "held a business or contractual arrangement to perform services *for*." (Doc. 82 at 20 (emphasis added)). To be a customer of Physiotherapy, Physiotherapy must have had an arrangement to perform services *for* that customer. But Physiotherapy performs services *for* Andrews' *patients*. (Doc. 75-16 at ¶ 3). The fact that Andrews and Physiotherapy communicate regarding their mutual patients in order to provide the best result for the patient does not constitute a "service" to Andrews. Indeed, Andrews is nothing more than a referral source for Physiotherapy. (Doc 82 at 26 (Mr. DeLoach's "most important role" was establishing Andrews as "a referral base of physicians" in order to ensure company success in the Market Area); Doc

83-1 ("Physiotherapy relies on physicians and physician groups as referral sources to develop its business and increase its patient base")).  Because Andrews Group is not a customer of Physiotherapy, Mr. DeLoach did not breach the anti-solicitation agreement even if he solicited Andrews Group.

### D. Breach of non-compete agreement

The Offer Letter's non-compete agreement provides that, during his employment with Physiotherapy and for a period of twelve months after he left the company, Mr. DeLoach could not "be employed by, perform services for, consult with, solicit business for, [or] participate in . . . any business which performs outpatient rehabilitation [ ] services . . . . within a ten (10) mile radius of any of [Physiotherapy's] facilities . . . at which [Mr. DeLoach] provided services . . . or for which [Mr. DeLoach] had . . . management or supervisory responsibility." (Doc. 1-1 at 4).  Among other arguments, Mr. DeLoach contends that he is entitled to summary judgment on the claim that he breached the non-compete agreement for the following reasons: (1) nothing he did before May 2017 breached the agreement because ATI did not "perform" outpatient rehabilitation services within the Market Area until then; and (2) nothing he did after May 2017 breached the agreement because he has not been involved in any of the ATI clinics within the Market Area since then.  (Doc. 75 at 28–29).

Physiotherapy responds that Mr. DeLoach nevertheless violated the terms of his non-compete by "play[ing] a critical role in preparing ATI to compete in . . . the Market Area." (Doc. 82 at 25). It may be true that Mr. DeLoach helped ATI prepare to compete in the Market Area, but the non-compete agreement does not prohibit Mr. DeLoach from working with a competitor who is *preparing* to perform outpatient rehabilitation or orthotics or prosthetic services; it prohibits Mr. DeLoach from working with a competitor who "*is performing*" these services. (Doc. 1-1 at 4 (emphasis added)). Nevertheless, Physiotherapy urges the Court to find that the scope of the non-compete includes preparation to compete, citing to a decision by the Alabama Court of Civil Appeals, which held that the term "'engaging in business' . . . involves not only the servicing or soliciting of customers but also means setting up an office or place of business for soliciting or servicing customers." (Doc 82 at 25 (citing *Dixon v. Royal Cup, Inc.*, 386 So. 2d 481,483 (Ala. Civ. App. 1980)).

Physiotherapy's reliance on *Dixon* is misplaced. The agreement is governed by Pennsylvania law, not Alabama law. (Doc. 1-1 at 5). Physiotherapy has not pointed to, and the court cannot find, a Pennsylvania case with a similar holding. And, even if *Dixon* were controlling precedent, Physiotherapy's agreement does not include a prohibition against a general "engaging" in business. In drafting the agreement, Physiotherapy chose to identify specific acts that constitute prohibited

competition.  As the drafter, Physiotherapy could have easily included language that prohibited preparing, establishing, and/or developing a business that performs the same services as Physiotherapy.  *See e.g.*, *Carim v. Reading Hosp. Surgi-Ctr. at Spring Ridge, LLC*, 2014 WL 10987056 at 2 (Pa. Super. Ct. Jan. 15, 2014) (hospital unambiguously "prohibited members from directly or indirectly establishing or developing" a competing surgical center).  Physiotherapy is bound by its decision to use the specific language "performs outpatient rehabilitation [ ] services."  *In re Estate of Hall*, 535 A.2d 47, 56 n.7 (Pa. 1987) ("[C]ourts are not generally available to rewrite agreements or make up special provisions for parties who fail to anticipate foreseeable problems.").

Physiotherapy has not presented evidence creating a genuine dispute of material fact about whether Mr. DeLoach breached his non-compete agreement or his non-solicitation agreement.  As a result, the court **WILL GRANT** Mr. DeLoach's motion for summary judgment as to Physiotherapy's claim for monetary damages.  And because the court will grant that motion, Physiotherapy's request for injunctive relief is moot.  Accordingly, the court **WILL DENY AS MOOT** the motion for summary judgment as to Physiotherapy's claim for injunctive relief, and **WILL DISMISS AS MOOT** that claim.

## IV.   CONCLUSION

The court **WILL GRANT IN PART** and **DENY IN PART** Mr. DeLoach's motion for summary judgment.   The court **WILL DISMISS AS MOOT** Physiotherapy's claim for injunctive relief, and **WILL DENY AS MOOT** Mr. DeLoach's motion for summary judgment as to the claim for injunctive relief. The court **WILL GRANT** Mr. DeLoach's motion for summary judgment on Physiotherapy's breach of contract claim, and **WILL ENTER SUMMARY JUDGMENT** in favor of Mr. DeLoach and against Physiotherapy as to that claim.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this September 17, 2018.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE